# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1298V
UNPUBLISHED

| | |
|---|---|
| ALLYSON LAVIGNE,<br><br>                Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                Respondent. | Chief Special Master Corcoran<br><br>Filed: May 12, 2022<br><br>Special Processing Unit (SPU);<br>Decision Awarding Damages; Pain and Suffering; Influenza (Flu) Vaccine; Shoulder Injury Related to Vaccine Administration (SIRVA) |

*Leah V. Durant*, Law Offices of Leah V. Durant, PLLC, Washington, DC, for Petitioner.

*Alexa Roggenkamp*, U.S. Department of Justice, Washington, DC, for Respondent.

## DECISION AWARDING DAMAGES[1]

On August 27, 2019, Allyson Lavigne filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a shoulder injury related to vaccine administration (SIRVA) resulting from adverse effects of an influenza (flu) vaccination she received on October 16, 2018. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters.

For the reasons described below, I find that Petitioner is entitled to an award of damages in the amount of **$199,587.14 - $198,000.00 for her actual pain and suffering, and $1,587.14 for her past unreimbursable expenses.**

---

[1] Because this unpublished decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002.  44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.     Relevant Procedural History

Approximately a year and a half after this case was initiated, on March 8, 2021, Respondent filed his Rule 4(c) Report conceding that Petitioner was entitled to compensation. ECF No. 19. A Ruling on Entitlement was issued on March 15, 2021. ECF No. 20. The parties thereafter attempted to informally resolve damages but were unsuccessful. ECF No. 26, 28. On December 27, 2021, I issued a scheduling order regarding the briefing of disputed damages issues. ECF No. 31. The parties filed their respective briefs (ECF Nos. 33 ("Br."), 34 ("Opp."), and 37 ("Resp.")). The parties agreed to argue their positions at a motions hearing, at which time I would decide the disputed damages issues. ECF. No. 36. That hearing was held on April 29, 2022,[3] and the case is now ripe for a determination.

## II.    Relevant Medical History

A complete recitation of the facts can be found in the Petition, in Respondent's Rule 4(c) Report, and in the parties' respective pre-hearing briefs.

In summary, at the time of vaccination, Ms. Lavigne was 27-year-old with a non-contributory medical history. *See, e.g.,* Ex. 2 at 5. Petitioner received a flu vaccine in her left deltoid on October 16, 2018. Ex. 1 at 25, Ex. 1 at 1.

On October 18, 2018, Petitioner presented to an orthopedist for pain in the left shoulder. Ex. 2 at 19. She was positive for joint pain and was having difficulty moving her arm. *Id*. Petitioner was administered her first subdeltoid steroid injection. *Id*. Two weeks later, on November 1, 2018, Petitioner returned to the orthopedist for a follow-up appointment, reporting that her shoulder was getting worse, not better. *Id.* at 17. It was noted that "[t]he injection worked for 4 or 5 days but the pain came back. The shoulder is tender and irritated. She can't do things with it as she would like . . . . She has tenderness along the anterior edge of the acromion. The CA ligament is extremely tender. It is almost like she has a fibrotic reaction." *Id*. Petitioner was scheduled for surgery the following day. *Id*.

Ms. Lavigne had surgery on November 2, 2018, including "[a]rthroscopy of shoulder, left side, manipulation under general anesthesia, subacromial decompression of a class II acromion to a class O. Significant scar tissue fibrosis resection, undersurface subdeltoid bursa resection for secondary scar formation, shoulder, left side." Ex. 6 at 7.

---

[3] At the end of the hearing held on April 29, 2022, I issued an oral ruling from the bench on damages in this case. That ruling is set forth fully in the transcript from the hearing. The transcript from the hearing is fully incorporated into this Decision. ECF No. 40.

Post-operative diagnoses were impingement syndrome, secondary fibrosis, and inflammation. *Id.*

Ms. Lavigne continued to have problems with her shoulder post-operatively, and on December 6, 2018, she was diagnosed with rotator cuff tendonitis despite the debridement, previous fibrosis, and irritation of the shoulder. Ex. 2 at 13. Petitioner was then administered her second subdeltoid steroid injection. *Id.*

Continuing to have shoulder pain and post-operative soreness, Petitioner was administered her third subdeltoid steroid injection on December 27, 2018. Ex. 2 at 11. At this visit, Petitioner was also prescribed Celebrex, a prescription anti-inflammatory drug. *Id.* At a follow-up appointment three and a half months post-surgery, Ms. Lavigne still had shoulder pain and tendonitis and was administered her fourth subdeltoid steroid injection on February 14, 2019. *Id.* at 9.

By April 4, 2019, Petitioner's orthopedist indicated that she was still having chronic pain, trouble sleeping at night, trouble going behind her head, and irritation posteriorly. Ex. 2 at 7. The orthopedist's assessments were pain in the left shoulder and ankylosis. *Id.* At that point, the orthopedist recommended an MRI, and Ms. Lavigne had an MRI on April 5, 2019. *Id.* at 7, 23. The MRI revealed, "1. Synovitis with small-to-moderate-sized joint effusion. No bone marrow edema or articular cartilage destruction to suggest an aggressive infectious process. 2. Rotator cuff tendinosis and mild bursitis. 3. Incomplete tat suppression versus probable reactive edema involving the distal clavicle and acromion, with no acute fracture identified." *Id.* at 23.

On April 22, 2019, Petitioner returned to her orthopedist for a six-month follow-up. Ex. 2 at 5. Petitioner was still positive for joint pain. *Id.* Petitioner was administered her fifth subdeltoid steroid injection and the orthopedist recommended commencing physical therapy (PT). *Id.* On April 23, 2019, Petitioner received a PT evaluation, which was positive for pain on all planes of motion of her left arm, and she had positive impingement tests. Ex. 3 at 6-7.[4] PT was recommended for two times per week for six weeks. Petitioner received PT from April 23, 2019, through May 17, 2019. *See id.* at 1-26.

On May 23, 2019, Ms. Lavigne returned to her orthopedist, nearly seven months post-surgery. Ex. 7 at 1. Petitioner was noted to have "progressively gotten worse because scar tissue matured and has irritation." *Id.* The orthopedist recommended a second surgery. *Id.* On May 31, 2019, Petitioner had her second surgery, including "[a]rthroscopic shoulder, left side, with intra-articular synovectomy, extraarticular

---

[4] The Exhibit 3 PT records appear to have been mislabeled as Exhibit 4. However, Exhibit 3 was identified in the Exhibit List as EW Motion Therapy and was filed after Exhibit 2 and before another exhibit also labeled Exhibit 4; therefore, I will nevertheless refer to and cite to these PT records as Exhibit 3.

3

subacromial synovectomy, bursectomy, decompression of scar tissue on the anterior deltoid, lateral deltoid, and subdeltoid bursa." *Id.* at 3. Post-operative diagnoses were fibrosis and impingement syndrome. *Id.*

On August 20, 2019, Ms. Lavigne presented to her second PT evaluation with decreased range of motion, strength, flexibility, joint mobility, soft tissue mobility, and increased edema, pain, impairments with posture, body mechanics, and lifting mechanics. Ex. 9 at 18. PT was recommended for two times per week for four weeks. Petitioner received PT from August 20, 2019, through September 12, 2019. Ex. *Id.* at 1-32. At discharge, Petitioner reported "feeling better" and that "she is doing good." *Id.* at 7. She also reported "that she has went back to her workout class and is doing good" and "doesn't have constant pain and she can now raise her arm without issue." *Id.*

On January 29, 2020, Ms. Lavigne presented to a Sports Medicine and Orthopaedic Center. Ex. 10 at 1. It was noted that Petitioner's left shoulder pain "was not significantly improved after having multiple arthroscopies and subacromial corticosteroid injection[s] . . . ." *Id.* Petitioner was noted to have "[t]enderness to palpation over the anterior aspect of the shoulder in the biceps tendon groove and pain with active and passive range of motion. Positive Speed's test and positive O'Brien's and Neer's test." *Id.* Petitioner began a trial of meloxicam, but only experienced mild improvement. *Id.* at 3-4. On March 16, 2020, Petitioner was administered her fifth subdeltoid steroid injection under ultrasound guidance. *Id.* at 5.

Due to the coronavirus Pandemic/COVID concerns, Petitioner explains, she has not returned to be seen in-person for SIRVA treatment since March 2020. Ex. 11 at 1. But she has continued to complete the recommended PT exercises at home, regaining much of the mobility in her shoulder in the process. *Id.* Her constant and severe pain has since largely resolved, and three years following the October 2018 flu shot, she is finally back participating in an exercise program and can engage in some of the hobbies she enjoyed prior to vaccination, though she still requires modified movements on some exercises due to mobility pain. *Id.*

### III. Legal Standard

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). Additionally, a petitioner may recover "actual unreimbursable expenses incurred before the date of judgment award such expenses which (i) resulted from the vaccine-related injury for which petitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . determined to be reasonably necessary." Section 15(a)(1)(B). The petitioner bears the burden of proof

4

with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

There is no mathematic formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("[a]wards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula"); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("the assessment of pain and suffering is inherently a subjective evaluation"). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

I may also consider prior pain and suffering awards to aid my resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g.*, *Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case."). And, of course, I may rely on my own experience (along with my predecessor Chief Special Masters) adjudicating similar claims.[5] *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).

Although pain and suffering in the past was often determined based on a continuum, as Respondent argues, that practice was cast into doubt by the Court several years ago. *Graves v. Sec'y of Health & Hum. Servs.,* 109 Fed. Cl. 579, 489-90 (2013). In *Graves*, Judge Merrow rejected a special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. Judge Merrow maintained that to do so resulted in "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Graves*, 109 Fed. Cl. at 590. Instead, Judge Merrow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims

---

[5] From July 2014 until September 2015, the SPU was overseen by former Chief Special Master Vowell. For the next four years, until September 30, 2019, all SPU cases, including the majority of SIRVA claims, were assigned to former Chief Special Master Dorsey, now Special Master Dorsey. In early October 2019, the majority of SPU cases were reassigned to me as the current Chief Special Master.

outside of the Vaccine Program. *Id.* at 595. Under this alternative approach, the statutory cap merely cuts off *higher* pain and suffering awards – it does not shrink the magnitude of *all* possible awards as falling within a spectrum that ends at the cap.

## IV. Appropriate Compensation for Petitioner's Pain and Suffering

In this case, Petitioner's awareness of her injury is not disputed, leaving only its severity and duration to be considered. In determining appropriate compensation for Petitioner's pain and suffering, I have carefully reviewed and considered the complete record in this case. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases, and relied upon my experience adjudicating such cases.[6] However, my determination is ultimately based upon the specific circumstances of this case.

Petitioner requests an award of $225,000.00 in past pain and suffering. Br. at 1,7. Petitioner argues that she "has undergone two surgeries and six painful steroid injections in her left shoulder. The severity of [P]etitioner's pain was so great . . . her orthopedic surgeon had her on the operating table only 17 days later." *Id.* at 10. Additionally, "the need for a second surgery on her shoulder less than seven months later is further evidence that [P]etitioner suffered a severely debilitating injury that could not be alleviated by conservative treatment." *Id.* Petitioner argues that it is indisputable that her injury was severe as evidenced by her "two surgeries (three surgical procedures), six steroid injections, multiple physical therapy sessions, multiple rounds of physical therapy, prescription pain killers, and anti-inflammatories," which did not fully eliminate her pain. *Id.* at 11 (footnote omitted). Petitioner asserts that although "her condition is currently better than it was at its worst," the "duration of [P]etitioner's injury has been long and will likely continue for the rest of her life. At age 29, [P]etitioner will likely have many years ahead of her in which to deal with the residual effects of SIRVA." *Id.* at 12.

Petitioner looked to comparative guidance for similar SIRVA cases where multiple surgeries were involved, including cases like *Schoonover* and *Lawson*.[7] Petitioner cited to several other cases that involved the issue of multiple surgeries, all awarding damages

---

[6] Statistical data for all SIRVA cases resolved in SPU from inception through January 2020 as well as a brief description of any substantive decisions can be found in the following decisions: *Vinocur v. Sec'y of Health & Hum. Servs.,* No. 17-0598V, 2020 WL 1161173 (Fed. Cl. Spec. Mstr. Jan. 31, 2020); *Wilt v. Sec'y of Health & Hum. Servs.,* No. 18-0446V, 2020 WL 1490757 (Fed. Cl. Spec. Mstr. Feb. 24, 2020); *Smallwood v. Sec'y of Health & Hum. Servs.,* No. 18-0291V, 2020 WL 2954958 (Fed. Cl. Spec. Mstr. Apr. 29, 2020).

[7] *Schoonover v. Sec'y of Health & Hum. Servs.*, No. 13-1324V, 2020 WL 5351341 (Fed. Cl. Spec. Mstr. Aug. 5, 2020) (awarding $200,000.00 for past pain and suffering); *Lawson v. Sec'y of HHS*, No. 18-882V, 2021 WL 688560 (Fed. Cl. Spec. Mstr. Jan. 5, 2021) (awarding $205,000.00 for past pain and suffering).

between $200,000.00 and $210,000.00. *See* Br. at 12-15. Petitioner argues that the fibrosis complicated her course "so much more than the petitioners in the other cases and more than justifies an award of $225,000.00." *Id.* at 15.

In response, Respondent recommended a pain and suffering award of no more than $157,500.00. Opp. at 1, 13. Respondent contends that during PT, "[P]etitioner consistently rated her pain at 3 or 4 (though the records do not indicate the top of the range of the pain scale) (*see* Ex. 3 at 9-21), and her range of motion was not significantly limited, even on initial evaluation . . . . " and "[s]he only attended seven appointments of PT for this period." *Id.* at 7-8; *see*, Ex. 9 at 26. Respondent also notes that "[b]y her own admission, [P]etitioner's symptoms largely resolved sometime between March 2020 and November 2021." *Id.* at 8. Otherwise, Petitioner consistently showed relatively mild limitation of motion and rated her pain consistently between 3 and 4, her injury was responsive to PT treatment, she showed good recovery after her surgeries, and her symptoms resolved somewhere between one and half and three years after vaccination. Thus, the scope of Petitioner's pain and suffering would be appropriately compensated by Respondent's proposed award. *Id.* at 9.

Respondent asserts, in reaction, that *Schoonover and Lawson* are distinguishable from the instant case and do not support Petitioner's requested damages award. Opp. at 9. Respondent argues that "awarding damages cannot be reduced down to 'two surgeries equal approximately $200,000.00.'" Rather, *Pruitt v. Sec'y of Health & Hum. Servs.*, No. 17-757V, 2020 WL 5292022 (Fed. Cl. Spec. Mstr. Oct. 29, 2021), which awarded the petitioner $185,000.00 in pain and suffering, is most analogous to the facts of Petitioner's case here. *Id.* at 12. Even though it is higher than Respondent's proposed award, *Pruitt* demonstrates (in Respondent's view) that "less severe SIRVA injuries, like [P]etitioner's, do not necessarily merit a $200,000.00 pain and suffering valuation," despite the fact that two surgeries were required. *Id.*

Pursuant to my oral ruling on April 29, 2022 (which is fully adopted herein), **I find that $198,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.**

While no one specific case is completely analogous to the circumstances herein, the cases cited by both Petitioner and Respondent are all instructive.[8] *Pruitt*, the comparable case offered by Respondent, is especially relevant - and it resulted in an award well *above* the $157,500.00 Respondent proposes. Respondent has not provided

---

[8] I acknowledge that none of the cases cited by Petitioner or Respondent are binding on this Decision. *See Nance v. Sec'y of Health & Human Servs.*, No. 06–730V, 2010 WL 3291896 at *8 (Fed. Cl. Spec. Mstr. July 30, 2010); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998) ("Special masters are neither bound by their own decisions nor by cases from the Court of Federal Claims, except, of course, in the same case on remand."). These cases do, however, provide persuasive guidance.

7

a compelling argument for why his preferred sum is appropriate.

In *Pruitt* the petitioner did require two surgeries, but there was a significant gap in treatment, as well as a significant gap between her surgeries. Also, Pruitt only received three steroid injections, and after her second surgery, there was no recommendation for continued treatment "since her pain is not constant and does not seem to be interfering with her life." *Pruitt*, 2020 WL 5292022, at *2-3, 8. Additionally, there was some question regarding whether Pruitt's second surgery for a SLAP tear was a direct sequela of her vaccination. *Id.* at 9. Thus, the facts of this case actually support a somewhat higher award than was allowed in *Pruitt*.

This case is also somewhat similar to *Schoonover* – but the facts therein are also sufficiently distinguishable to support a slightly lower award in this case. The *Schoonover* petitioner reported constant pain, she had pain at rest, she often described pain with activity as severe, with a rating of eight out of ten. Petitioner's pain also did not improve following multiple steroid injections – or the two surgeries she experienced. *Schoonover*, at *4. Ultimately, that petitioner underwent lengthy and significant medical and surgical care and treatment and suffered episodes of severe pain and limited mobility. *Id.* at *5. The *Schoonover* petitioner was therefore awarded $200,000 in past pain and suffering and $1,200 per year for her life expectancy, reduced to net present value. *Id.* at *6.

In this case, we can infer that Ms. Lavigne was experiencing a significant enough amount of pain to warrant an initial surgery less than three weeks after vaccination, and a second surgery six months after that. This alone describes a more severe SIRVA than what many Program claimants experience. However, the record is largely silent on the severity of her *pain* specifically. Moreover, Ms. Lavigne did not undergo the numerous rounds of PT over several years as did the petitioner in *Schoonover*.

There is no question that Petitioner's SIRVA and the overall course she faced, including the number of surgeries, the number of steroid injections, and the duration of her injury, support a higher-than-normal award for pain and suffering in this case. Based on the current records, in just over the course of a year and a half, Petitioner underwent two surgeries, six steroid injections, two rounds of PT, and required prescription pain medication and anti-inflammatories. Petitioner's course was also further complicated by the scar tissue fibrosis that was caused by the vaccination. *See, e.g.*, Ex. 2 at 11; Ex. 6 at 7; Ex. 7 at 1, 4, 6. Nevertheless, the record establishes that she did have instances documented in the record where she experienced some relief from her pain. *See e.g.*, Ex. 4 at 17, 20; Ex. 7 at 4; Ex. 9 at 7. And by November 30, 2021, she reported "I am feeling better" and that she is "finally back participating in an exercise program and can engage in some of the hobbies [she] enjoyed prior to vaccination." Ex. 11 at 1.

8

I acknowledge that Ms. Lavigne may still have some sequelae from her SIRVA, but it appears that she largely recovered from the worst of her injury by 2019. Even accounting for COVID, which I credit, there was not an on-going effort of Petitioner seeking treatment. Thus, an award a bit lower than what was allowed in *Schoonover* is most appropriate.

## V.     Conclusion

For all of the reasons discussed above, and based on consideration of the record as a whole, **I find that $198,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[9] I also find that Petitioner is entitled to $1,587.14 in actual past unreimbursable expenses.**

Accordingly, **I award Petitioner a lump sum payment of $199,587.14 in the form of a check payable to Petitioner.** This amount represents compensation for all damages that would be available under § 15(a).

The clerk of the court is directed to enter judgment in accordance with this Decision.[10]

**IT IS SO ORDERED.**

> **s/Brian H. Corcoran**
> Brian H. Corcoran
> Chief Special Master

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required.  *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.